UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

RONALD ALBERT WILLIS,

           Petitioner,

    v.

A. P. KANE, warden,

           Respondent.

_____/

No. C 05-3153 MHP (pr)

**ORDER GRANTING HABEAS PETITION**

## INTRODUCTION

Ronald Albert Willis, a prisoner at the Correctional Training Facility in Soledad, filed this pro se action seeking a writ of habeas corpus under 28 U.S.C. § 2254. This matter is now before the court for consideration of the merits of the petition. After 18 years of incarceration on his 15-to-life sentence during which he has exhibited exemplary behavior, Willis' crime does not provide some evidence to support the parole board's decision that he is currently unsuitable for parole. The petition will be granted.

## BACKGROUND

Ronald Albert Willis was convicted in 1985 in Los Angeles County Superior Court of second degree murder. He was sentenced to a prison term of fifteen years to life. His habeas petition does not concern that conviction directly, but instead focuses on an August 28, 2003 decision by the Board of Prison Terms (now known as the Board of Parole Hearings ("BPH")) finding him unsuitable for parole.

1    The specifics regarding the crime and the circumstances regarding parole suitability
2  are described in the Discussion section later in this order and are only mentioned here in
3  brief.  Willis killed his 19-month old daughter in September 1983.  He hit her several times
4  in the head and failed to obtain medical help when she exhibited signs of distress.  After the
5  baby was dead, Willis disposed of her body by first hiding it in a closet and then putting it in
6  a dumpster.  He initially reported to police that she had been kidnapped but, within about two
7  days, confessed to killing her.  Willis had no criminal history.  He has exhibited very positive
8  behavior during his 18 years in state prison since the conviction.  He also has some parole
9  plans, albeit not in the county of commitment.

10    The BPH found Willis unsuitable for parole, relying primarily on the circumstances
11  of the offense.  The BPH also stated that Willis had not sufficiently participated in beneficial
12  self-help and therapy programming and that he did not have realistic parole plans.

13    Willis sought relief in the California courts.  The Los Angeles County Superior Court
14  denied his petition for writ of habeas corpus on December 21, 2004.  <u>See</u> Resp. Motion to
15  Dismiss, Exh. B to Exh. A.   The California Court of Appeal summarily denied his petition
16  for writ of habeas corpus.  The California Supreme Court summarily denied his petition for
17  review.

18    Willis then filed his federal petition for writ of habeas corpus.  After an unsuccessful
19  motion to dismiss, respondent filed an answer.   Willis filed a traverse.  The matter is now
20  ready for a decision on the merits.

21                              **JURISDICTION AND VENUE**

22    This court has subject matter jurisdiction over this habeas action for relief under 28
23  U.S.C. § 2254.  28 U.S.C. § 1331.  This action is in the proper venue because Willis is in
24  custody and the challenged action occurred at the Correctional Training Facility in Soledad
25  in Monterey County, California, within this judicial district.  28 U.S.C. §§ 84, 2241(d).

26                                       **EXHAUSTION**

27    Prisoners in state custody who wish to challenge collaterally in federal habeas
28  proceedings either the fact or length of their confinement are required first to exhaust state

1    judicial remedies, either on direct appeal or through collateral proceedings, by presenting the

2    highest state court available with a fair opportunity to rule on the merits of each and every

3    claim they seek to raise in federal court.  See 28 U.S.C. § 2254(b), (c).  The court previously

4    determined that state court remedies were exhausted.  See Order Denying Motion To Dismiss

5    And Setting Briefing Schedule, pp. 5-6.

6                                    **STANDARD OF REVIEW**

7            This court may entertain a petition for writ of habeas corpus "in behalf of a person in

8    custody pursuant to the judgment of a State court only on the ground that he is in custody in

9    violation of the Constitution or laws or treaties of the United States."  28 U.S.C. § 2254(a).

10   The petition may not be granted with respect to any claim that was adjudicated on the merits

11   in state court unless the state court's adjudication of the claim:  "(1) resulted in a decision that

12   was contrary to, or involved an unreasonable application of, clearly established Federal law,

13   as determined by the Supreme Court of the United States; or (2) resulted in a decision that

14   was based on an unreasonable determination of the facts in light of the evidence presented in

15   the State court proceeding."  28 U.S.C. § 2254(d); see Williams (Terry) v. Taylor, 529 U.S.

16   362, 409-13 (2000).   Section 2254(d) applies to a habeas petition from a state prisoner

17   challenging the denial of parole.  See Sass v. California Board of Prison Terms, 461 F.3d

18   1123, 1126-27 (9th Cir. 2006).

19           The application of § 2254(d) in this case is affected by the fact that there is no

20   reasoned explanation by a state court for the rejection of Willis' habeas petitions on the

21   merits.  The Los Angeles County Superior Court denied Willis' habeas petition due to his

22   failure to provide the 1999 report which had been referred to and relied upon by the BPH

23   when it denied parole in 2003.  See Resp. Motion to Dismiss, Exh. B to Exh. A.   As this

24   court previously found, that was a curable procedural defect, cf. Kim v. Villalobos, 799 F.2d

25   1317, 1319 (9th Cir. 1986), and Willis cured the defect when he filed his habeas petition in

26   the California Court of Appeal and attached to it the 1999 report which the superior court had

27   said was necessary to review his claims.  This court will not look through the unexplained

28   denial of Willis' petitions by the California Court of Appeal and California Supreme Court to

                                                    3

rely on the last explained decision because those courts did not reject Willis' habeas petition for the same procedural reason the Los Angeles Superior Court did.  The state courts to reach the merits gave no reasoned explanation of the denial of the petitions.  Where, as here, the state court gives no reasoned explanation of its decision, an "independent review of the record" is the only means of deciding whether the state court's decision was objectively reasonable.  Himes v. Thompson, 336 F.3d 848, 853 (9th Cir. 2003).

**DISCUSSION**

A.     Due Process Requires That Some Evidence Support A Parole Denial

A California prisoner with a sentence of a term of years to life with the possibility of parole has a protected liberty interest in release on parole and therefore a right to due process in the parole suitability  proceedings.  See Sass, 461 F.3d at 1127-28; Board of Pardons v. Allen, 482 U.S. 369 (1987); Greenholtz v. Inmates of Nebraska Penal & Corr. Complex, 442 U.S. 1 (1979); Cal. Penal Code § 3041(b).

A parole board's decision satisfies the requirements of due process if "some evidence" supports the decision.  Sass, 461 F.3d at 1128-29 (adopting some evidence standard for disciplinary hearings outlined in Superintendent v. Hill, 472 U.S. 445, 454-55 (1985)).

"To determine whether the some evidence standard is met 'does not require examination of the entire record, independent assessment of the credibility of witnesses, or weighing of the evidence.  Instead, the relevant question is whether there is any evidence in the record that could support the conclusion reached'" by the parole board or the governor. Id. at 1128 (quoting Superintendent v. Hill, 472 U.S. at 455-56).  The "some evidence standard is minimal, and assures that 'the record is not so devoid of evidence that the findings of the . . . board were without support or otherwise arbitrary.'"  Id. at 1129 (quoting Superintendent v. Hill, 472 U.S. at 457).  The some evidence standard of Superintendent v. Hill is clearly established law in the parole context for purposes of § 2254(d).  Sass, 461 F.3d at 1129.

A critical issue in parole denial cases concerns the BPH's use of evidence about the murder that led to the conviction.  Three Ninth Circuit cases provide the guideposts for

applying the Superintendent v. Hill some evidence standard on this point: Biggs v. Terhune, 334 F.3d 910 (9th Cir. 2003), Sass, 461 F.3d 1123, and Irons v. Carey, 479 F.3d 658 (9th Cir. 2007).  Biggs explained that the value of the criminal offense fades over time as a predictor of parole suitability:  "The Parole Board's decision is one of 'equity' and requires a careful balancing and assessment of the factors considered. . . .  A continued reliance in the future on an unchanging factor, the circumstance of the offense and conduct prior to imprisonment, runs contrary to the rehabilitative goals espoused by the prison system and could result in a due process violation."  Biggs, 334 F.3d at 916-17.  Biggs upheld the initial denial of a parole release date based solely on the nature of the crime and the prisoner's conduct before incarceration, but cautioned that "[o]ver time . . . , should Biggs continue to demonstrate exemplary behavior and evidence of rehabilitation, denying him a parole date simply because of the nature of Biggs' offense and prior conduct would raise serious questions involving his liberty interest in parole."  Id. at 916.  Next came Sass, which  criticized the Biggs statements as improper and beyond the scope of the dispute before the court:  "Under AEDPA it is not our function to speculate about how future parole hearings could proceed."  Sass, 461 F.3d at 1129.  Sass determined that the parole board is not precluded from relying on unchanging factors such as the circumstances of the commitment offense or the parole applicant's pre-offense behavior in determining parole suitability.  See id. at 1129 (commitment offenses in combination with prior offenses provided some evidence to support denial of parole at subsequent parole consideration hearing).  Recently, Irons determined that due process was not violated by the use of the commitment offense and pre-offense criminality to deny parole for a prisoner 16 years into his 17-to-life sentence.  Irons emphasized that all three cases (Irons, Sass and Biggs) in which the court had "held that a parole board's decision to deem a prisoner unsuitable for parole solely on the basis of his commitment offense comports with due process, the decision was made before the inmate had served the minimum number of years required by his sentence."  Irons, 479 F.3d at 665; see e.g., id. at 660 (inmate in 16th actual year of his 17-to-life sentence).

The message of these three cases is that the BPH can look at immutable events, such

as the nature of the conviction offense and pre-conviction criminality, to predict that the prisoner is not currently suitable for parole even after the initial denial (<u>Sass</u>), but the weight to be attributed to those immutable events should decrease over time as a predictor of future dangerousness as the years pass and the prisoner demonstrates favorable behavior (<u>Biggs</u> and <u>Irons</u>). <u>Sass</u> did not dispute the principle that, other things being equal, a murder committed 50 years ago is less probative of a prisoner's current dangerousness than one committed 10 years ago. Not only does the passage of time in prison count for something, exemplary behavior and rehabilitation in prison count for something according to <u>Biggs</u> and <u>Irons</u>. <u>Superintendent v. Hill</u>'s standard might be quite low, but it does require that the decision <u>not</u> be arbitrary, and reliance on only the facts of the crime might eventually make for an arbitrary decision.

Having determined that there is a due process right, and that some evidence is the evidentiary standard for judicial review, the next step is to look to state law because that sets the criteria to which the some evidence standard applies. One must look to state law to answer the question, "'some evidence' of what?"

B.    <u>State Law Standards For Parole For Murderers In California</u>

California uses indeterminate sentences for most non-capital murderers, with the term being life imprisonment and parole eligibility after a certain minimum number of years. A first degree murder conviction yields a base term of 25 years to life and a second degree murder conviction yields a base term of 15 years to life imprisonment. <u>See</u> <u>In re Dannenberg</u>, 34 Cal. 4th 1061, 1078 (Cal.), <u>cert. denied</u>, 126 S. Ct. 92 (2005); Cal. Penal Code § 190. California's parole scheme described below provides that a release date normally must be set unless various factors exist, but the "unless" qualifier is substantial.

A BPH panel meets with an inmate one year before the prisoner's minimum eligible release date "and shall normally set a parole release date. . . . The release date shall be set in a manner that will provide uniform terms for offenses of similar gravity and magnitude in respect to their threat to the public, and that will comply with the sentencing rules that the Judicial Council may issue and any sentencing information relevant to the setting of parole

release dates." Cal. Penal Code § 3041(a).  Significantly, that statute also provides that the panel "shall set a release date unless it determines that the gravity of the current convicted offense or offenses, or the timing and gravity of current or past convicted offense or offenses, is such that consideration of the public safety requires a more lengthy period of incarceration for this individual, and that a parole date, therefore, cannot be fixed at this meeting." Cal. Penal Code § 3041(b).

One of the implementing regulations, 15 Cal. Code Regs. § 2401, provides:  "A parole date shall be denied if the prisoner is found unsuitable for parole under Section 2402(c).  A parole date shall be set if the prisoner is found suitable for parole under Section 2402(d).  A parole date set under this article shall be set in a manner that provides uniform terms for offenses of similar gravity and magnitude with respect to the threat to the public."[1]  The regulation also provides that "[t]he panel shall first determine whether the life prisoner is suitable for release on parole.  Regardless of the length of time served, a life prisoner shall be found unsuitable for and denied parole if in the judgment of the panel the prisoner will pose an unreasonable risk of danger to society if released from prison." 15 Cal. Code Regs. § 2402(a).  The panel may consider all relevant and reliable information available to it.  15 Cal. Code Regs. § 2402(b).  As noted earlier, the governor's review must be done on the basis of the same factors the parole authority is required to consider.  See Cal. Penal Code § 3041.2; Cal. Const. art. V, § 8(b).

The regulations contain a matrix of suggested base terms for several categories of crimes.  See 15 Cal. Code Regs. § 2403.  For example, for second degree murders, the matrix of base terms ranges from the low of 15, 16, or 17 years to a high of 19, 20, or 21 years, depending on some of the facts of the crime.   Some prisoners estimate their time to serve based only on the matrix.   However, going straight to the matrix to calculate the sentence puts the cart before the horse because it ignores critical language in the relevant statute and regulations that requires the prisoner first to be found suitable for parole.

The statutory scheme places individual suitability for parole above a prisoner's expectancy in early setting of a fixed date designed to ensure term uniformity.  Dannenberg,

1    34 Cal. 4th at 1070-71.  Under state law, the matrix is not reached unless and until the

2    prisoner is found suitable for parole.  Id. at 1070-71; 15 Cal. Code Regs. § 2403(a) ("[t]he

3    panel shall set a base term for each life prisoner who is found suitable for parole").  The

4    California Supreme Court's determination of state law in Dannenberg is binding in this

5    federal habeas action.  See Hicks v. Feiock, 485 U.S. 624, 629-30 (1988).

6         The California Supreme Court also has determined that the facts of the crime can

7    alone support a sentence longer than the statutory minimum even if everything else about the

8    prisoner is laudable.  "While the Board must point to factors beyond the minimum elements

9    of the crime for which the inmate was committed, it need engage in no further comparative

10   analysis before concluding that the particular facts of the offense make it unsafe, at that time,

11   to fix a date for the prisoner's release."  Dannenberg, 34 Cal. 4th at 1071; see also In re

12   Rosenkrantz, 29 Cal. 4th 616, 682-83 (Cal. 2002), cert. denied, 538 U.S. 980 (2003) ("[t]he

13   nature of the prisoner's offense, alone, can constitute a sufficient basis for denying parole"

14   but might violate due process "where no circumstances of the offense reasonably could be

15   considered more aggravated or violent than the minimum necessary to sustain a conviction

16   for that offense").

17   C.   The BPH's Decision Was Not Supported By Some Evidence

18        The BPH identified three reasons for its decision that Willis was unsuitable for parole,

19   i.e., the circumstances of the offense, his insufficient participation in beneficial self-help and

20   therapy programming, and the absence of realistic parole plans in the last county of legal

21   residence.  The court now independently reviews the record, examining the BPH's three

22   reasons in reverse order because the denial hinges on the commitment offense, rather than the

23   need for further therapy/programming and better parole plans.

24        1.   Self-Help And Therapy Programming

25        The BPH determined that Willis had "not sufficiently participated in beneficial self-

26   help and therapy programming at this time" in its decision finding him unsuitable for parole.

27   RT 30.

28        The BPH can consider psychological factors in determining parole suitability because

it is required to consider all relevant reliable information, including information about "past and present mental state, [and] past and present attitude toward the crime."  15 Cal. Code Regs. § 2402(b).  The BPH's reliance on the failure to sufficiently participate in programming is not supported by some evidence in this case.  Interestingly, even respondent does not defend the BPH's reliance on this factor in his answer.

The psychological evaluations and life prisoner evaluations showed that Willis had participated in numerous programs in this category.  The March 20, 2000 psychological evaluation found no mental illness, "[n]o evidence of a mood or thought disorder," and identified no need for further treatment or programming.  Traverse, Exh. A, p. 3.  The psychologist described several programs Willis had participated in: "In addition to attending Alcoholics Anonymous, this inmate has attended a number of other self-help programs.  In 1991, he completed Life Skills training with Dr. Bakeman at CTF.  In 1994, he completed Life Skills training with Dr. Bakeman at CTF.  In 1995, he completed a second Life Skills group with Dr. Bakeman.  In 1997, he completed individual therapy with Dr. Terrini at CTF."  Id. at p. 4.  Willis also had favorable chronos (i.e., memoranda) in his file from various years showing his participation in various activities and therapy programs.  See Traverse, Exh. E.  He was on a waiting list to get into an AA-type program and had been in AA in the past.  See RT 16-17.  In light of the favorable psychological reports and the absence of any mention therein of a need for further self-help or therapy programming, there was not some evidence to support the BPH's determination that Willis had not sufficiently participated in beneficial self-help and therapy programming.

2.    Parole Plans

The BPH also relied on Willis' inadequate parole plans to find him unsuitable for parole: "the prisoner does not have realistic parole plans in the last county of legal residence." RT 30.

A circumstance tending to show suitability for parole is that the "prisoner has made realistic plans for release or has developed marketable skills that can be put to use upon release."  15 Cal. Code Regs. § 2402(d)(8).  The BPH's reliance on the absence of realistic

1    parole plans was not a sufficient reason to deny parole for Willis.  Interestingly, respondent

2    does not defend the BPH's reliance on this factor.

3          As even the BPH noted, Willis did "have some alternative plans" for parole although

4    not in the county of his last legal residence.  RT 30.  Willis planned to live with his parents in

5    Florida, who had agreed with that plan, when he could relocate to that state.  <u>See</u> Traverse,

6    Exh. A, p. 3 & Exh. F.  Willis also had developed parole plans in California as he was

7    requested to do at his hearing in 2000.  He had been accepted at Hacienda House, a live-in

8    Christian transition center in Riverside County.  <u>See</u> Traverse, Exh. C.  Although a prisoner

9    normally is to be paroled to "the county that was the last legal residence of the inmate prior

10   to his . . . incarceration," he may "be returned to another county if that would be in the best

11   interests of the public."  <u>See</u> Cal. Penal Code § 3003(a) & (b).  Among the factors that may

12   be considered in determining whether to use an alternative county as a parole destination are

13   the "verified existence of a work offer, or an educational or vocational training program" and

14   the existence of a family "whose support would increase the chance that the inmate's parole

15   would be successfully completed."  Cal. Penal Code § 3003(b)(4).  The statute also allows

16   for parole to another state.  Cal. Penal Code § 3003(j); <u>see also</u> Cal. Penal Code § 11175 <u>et</u>

17   <u>seq</u>. (Uniform Act For Out-Of-State Parolee Supervision); Fla. Stat. Ann. § 949.07 <u>et seq</u>.

18   (same).  Willis' plans to enter a transitional home in Riverside County or to move in with his

19   parents in Florida could be accommodated if he was otherwise suitable for parole.  He also

20   had developed a marketable skill in graphic arts and offset printing.  The record supports an

21   inference that Willis could succeed and not soon find himself homeless and jobless if

22   paroled.

23          3.    <u>Commitment Offense</u>

24          The murder was the "paramount" reason for the unsuitability determination.  <u>See</u> RT

25   28.  The crime was described in the 1999 life prisoner evaluation report, which the BPH

26   incorporated by reference into the record at the 2003 hearing:

27          According to the Probation Officer's Report dated July 29, 1985, on the evening of
             Sunday, September 11, 1983, Willis was preparing dinner for his two children,
28           Barbara Jean, age three, and Mary Lynn, approximately 19 months.  Mary Lynn was

10

playing in the kitchen, which upset Inmate Willis, and he grabbed her and took her back into the living room and told her to stay out.  Mary Lynn returned and Inmate Willis became extremely angry and struck her with his open hand at least three times on the head.  She fell and apparently hit her head on the floor. Mary Lynn began to cry and, shortly after being returned to the living room area, began to vomit.  She stopped throwing up prior to dinner being ready and Willis served her dinner, although she appeared extremely drowsy.  The child would not eat normally and this upset Willis, who struck the table to scare her.  The child did not manage to eat well enough and this did not satisfy Willis, who struck her several more times in the head with his open hand.  He indicated that he had been drinking alcohol at that time.

The following morning, Mary Lynn had bruises under her eye and several on her head.  Willis was afraid to take her for medical treatment as he felt he would lose custody of the children, which he had gained through the Juvenile Courts, if the hospital reported that he had been abusing the children.

On Tuesday, Mary Lynn was climbing on the couch in the living room and Willis swatted her several times on the butt.  She fell to the floor, striking her head.  That night, Mary Lynn again began to throw up and lapse into a lethargic and coma-like state.

The following morning, Wednesday, September 14, 1983, Willis placed Mary Lynn back into her crib where she remained through most of the morning.  At about noon, he checked on her and discovered that she was dead.  He placed Mary Lynn's body in the bedroom closet.

Early Thursday morning, September 15, 1983, Willis removed Mary Lynn's body from the closet and placed it into a plastic trash bag which he placed in the dumpster behind his apartment building.

RT 9; Traverse, Exh. D (1999 Life Prisoner Evaluation Report), pp. 1-2.  On September 16, 1983, Willis reported to the Long Beach police that his daughter had been kidnapped. Encouraged by police to do so, he made a plea on the evening news for the return of his daughter.  Detectives noticed conflicts in the stories he told.  Willis confessed to investigators at about 5:00 a.m. on September 17.  Id. at 2.  The baby's body was recovered on September 19, 1983.  An autopsy fixed the cause of death as blunt force trauma to the head.  Id.

The life prisoner evaluation report stated that Willis had the same feelings in 1999 as those he had when sentenced: "He is remorseful, has guilty feelings and has difficulty in coping with the realization that he cannot say that he is sorry to Mary Lynn, although he appeared unable to specifically address the murder.  He indicated that problems which led to this incident were compounded by the stress that he was facing due to a pending breakup with his girlfriend, the knowledge that his unemployment benefits were running out,

11

1   compounded by his inability to find a baby-sitter so that he could seek employment." Id.

2        A circumstance tending to indicate unsuitability for parole is that "the prisoner

3   committed the offense in an especially heinous, atrocious or cruel manner."  15 Cal. Code

4   Regs. § 2402(c)(1).  The factors to be considered in determining whether that circumstance

5   exists are that there were multiple victims, "[t]he offense was carried out in a dispassionate

6   and calculated manner, such as an execution-style murder," "[t]he victim was abused, defiled

7   or mutilated during or after the offense," "[t]he offense was carried out in a manner which

8   demonstrates an exceptionally callous disregard for human suffering," and "[t]he motive for

9   the crime is inexplicable or very trivial in relation to the offense."  15 Cal. Code Regs. §

10   2402(c)(1).

11        The BPH's consideration of the commitment offense was certainly permissible. The

12   BPH stated that the paramount reason for the denial of parole "would be the timing and

13   gravity of the committing offense.  The offense was carried out in a vicious and brutal

14   manner.  The offense was carried out in a dispassionate and calculated manner."  RT 28.

15   Willis had hit the toddler on several occasions and even after she displayed signs of being

16   injured or sick, chose not to seek medical aid, and chose to hide and dispose of the toddler's

17   body once she died.  He then went to report her as having been kidnapped.  The BPH stated

18   that the "offense was carried out in a dispassionate . . .  manner which demonstrates an

19   exceptionally insensitive disregard for human sufferings" and done for an inexplicable or

20   trivial motive.  Id. at 29.

21        That this was a terrible crime is not disputed.  Willis stated, "I know what I did was

22   disgusting."  RT 27.   His attorney stated, "There's no question it's a horrendous crime.  No

23   question whatsoever."  RT 26.  There was sufficient evidence for the BPH to determine that

24   Willis committed the offense in an especially cruel manner.   The facts of that crime will be

25   just as terrible 20 years from today as they are today and as they were 20 years ago.

26   Notwithstanding the terrible nature of the crime, the critical question the BPH was supposed

27   to decide at the parole suitability hearing was whether "consideration of the public safety

28   requires a more lengthy period of incarceration for this individual."  See Cal. Penal Code §

12

3041(b).  When the totality of circumstances are considered, Willis' 1983 crime did not provide sufficient evidence to find him unsuitable for parole in 2003.  Willis' case is the kind of case Biggs and Irons cautioned about: the continued reliance on the immutable events of the crime to deny parole for present dangerousness despite the candidate's exemplary behavior in prison, favorable current psychological reports, and the absence of any other violence or criminal record.

Willis' in-prison behavior was positive.  He had received only one serious rule violation report during his 18 years in the prison system, and that was 14 years before the parole hearing at issue and not for a violent offense.  See Traverse, Exh. I, disciplinary sheet.  On June 13, 1989 he received a CDC-115 rule violation report for "refusing to transfer to CTF-N" for which he was assessed a loss of 30 days time credits.   He also received three CDC-128s (i.e., counselling memoranda) for minor infractions of failing to respond to a medical pass in 1988, failing to respond to a medical pass in 1991, and delaying lock-up in 1993.  See Traverse, Exh. I, disciplinary sheet.  Willis' favorable conduct in prison reduces the predictive value of the 1983 crime.

Willis also had obtained a B.A. degree in social sciences during his incarceration.  He also held a job and did volunteer work while in custody.  See Traverse, Exh. E.

Also noteworthy was the favorable "assessment of dangerousness" by the psychologist in the 1999 report.  The psychologist opined that Willis had a violence potential "significantly below average relative to this Level II inmate population."  Traverse, Exh. A, p. 4.  This opinion was based on the fact that Willis was a first term prisoner without any prior criminal history, the existence of only the single serious rule violation report in 1989, his positive programming, the absence of psychopathology, his attendance in "a large number of self-help programs" and the fact that he appeared "to have matured greatly from the structure within CDC and from the extensive counselling."  Id.  Unlike some prisoners who take years to appreciate the wrongness of their conduct, Willis apparently had understood it since the beginning of his incarceration and had been remorseful before he even got to prison.  The psychologist also opined that, if released from prison, "his violence potential is

considered to be no more than the average citizen in the community." <u>Id.</u>  And the

psychologist noted that there were no significant risk factors which may be precursors to

violence for Willis.  <u>Id.</u>   Most importantly, the psychologist did <u>not</u> recommend further

treatment.  <u>Id.</u> at 5.

Among the listed circumstances tending to show suitability, several were present here:

Willis had no juvenile record or criminal history.  15 Cal. Code Regs. § 2402(d)(1) & (6).

Willis was 46 years old at the time of the hearing, and his age "reduces the probability of

recidivism." 15 Cal. Code Regs. § 2402(d)(7); Traverse, Exh. B.  Willis had "developed

marketable skills that can be put to use upon release."  15 Cal. Code Regs. § 2402(d)(8).  He

had been in the vocational graphic arts and offset printing program.  <u>See</u> Traverse, Exhs. E

and F.  He had received "excellent work reports."  RT 16.

Willis apparently had been in custody even longer than his 18 years in the state prison

system because he had earned credits for time spent in custody before his arrival in the state

prison system.  <u>See</u> Traverse, p. 17, nn. 19-20.  He may have been in custody since the day

he confessed to the crime.  If so, he had been in custody almost 20 years at the time of the

2003 hearing.  <u>See id.</u> at 18.

When Willis was denied parole in 2003, it was the seventh time he was found not

suitable for parole.  It appears that the commitment offense was the paramount reason at each

decision, as Willis' otherwise favorable profile had not changed in years: almost discipline-

free in prison, no substance abuse problem, a stable social history and no criminal activity

other than the murder.

The some evidence standard provides protection against more than fabricated charges

or bureaucratic mistakes -- the some evidence standard also protects against arbitrary

decisions.  <u>See</u> <u>Superintendent v. Hill</u>, 472 U.S. at 454-55, 457.  Willis' commitment offense

repeatedly has been relied on to deny parole notwithstanding the extensive evidence on the

other side of the scale: there was positive evidence of good behavior and rehabilitation in

prison, there was a complete absence of evidence of any other violent acts by Willis, there

was a complete absence of any other criminal record, and there was an absence of any

1  suggestion of a need for further therapy or self-help type programming by the mental health

2  professionals who examined him.  Under these circumstances, the BPH's reliance on the

3  circumstances of the murder to find Willis unsuitable for parole for the seventh time and at

4  least 18 years into his 15-to-life sentence was arbitrary and therefore did not comport with

5  the some evidence standard.  It violated due process.  The state court's unexplained decision

6  to the contrary was an unreasonable application of <u>Superintendent v. Hill</u>.   Willis is entitled

7  to relief under the standard of 28 U.S.C. § 2254(d).

8  E.      <u>Willis Is Entitled To Have His Term Set</u>

9          Willis' petition for writ of habeas corpus is GRANTED.  Having decided that the

10  petition will be granted, the next issue concerns the proper remedy.  Because Willis has never

11  been found suitable for parole, the BPH has never moved past the suitability-finding function

12  in California Penal Code § 3041(b) to calculate a term and set a release date as required by §

13  3041(a).  It is now time to do so.  Within **thirty days** of the date of this order, the BPH must

14  calculate a term for Willis and set a date for his release in accordance with the requirements

15  of California Penal Code § 3041(a).  This does not necessarily mean that the release date

16  must occur within thirty days of the date of this order, but rather that the BPT must act within

17  that time limit.  Within **forty days** of the date of this order, respondent must file a notice with

18  the court identifying the date set for Willis' release.

19                                    **CONCLUSION**

20          For the foregoing reasons, the petition for writ of habeas corpus is granted.  Within

21  **thirty days** of the date of this order, the BPH must calculate a term for Willis and set a date

22  for his release in accordance with the requirements of California Penal Code § 3041(a).

23  Within **forty days** of the date of this order, respondent must file and serve a notice of the

24  date set for Willis' release.

25          IT IS SO ORDERED.

26  DATED:   April 25, 2007

27                                    _____
                                      Marilyn Hall Patel
                                      United States District Judge

28

15

1

## **<u>NOTE</u>**

2

1.      The listed circumstances tending to show <u>unsuitability</u> for parole are the nature of the commitment offense, i.e., whether the prisoner committed the offense in "an especially heinous, atrocious or cruel manner;" the prisoner has a previous record of violence; the prisoner has an unstable social history, the prisoner previously engaged in a sadistic sexual offense, the prisoner has a lengthy history of severe mental problems related to the offense; and negative institutional behavior.  15 Cal. Code Regs. § 2402(c).  The listed circumstances tending to show <u>suitability</u> for parole are the absence of a juvenile record, stable social history, signs of remorse, a stressful motivation for the crime, whether the prisoner suffered from battered woman's syndrome, lack of criminal history, the present age reduces the probability of recidivism, the prisoner has made realistic plans for release or developed marketable skills, and positive institutional behavior.  15 Cal. Code Regs. § 2402(d).

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28